# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JUDITH GRAY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 15-10276-TSH** |
| THOMAS A. CUMMINGS, et al. | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### March 15, 2017

Hennessy, M.J.

By Order of Reference dated May 15, 2015, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #16), this case was referred to me for a report and recommendation on all dispositive motions. (Docket #16). On March 1, 2016, Defendants Thomas A. Cummings and the Town of Athol filed a motion for summary judgment. (Docket #40). Plaintiff Judith Gray filed an opposition to the motion on April 8, 2016 (Docket #48), to which Defendants responded on April 28, 2016 (Docket #49). This matter is now ripe for adjudication. For the reasons that follow, I RECOMMEND that the motion for summary judgment be ALLOWED.

## I.     BACKGROUND

As a preliminary matter, "[e]vidence that would be inadmissible at trial cannot be considered on a motion for summary judgment." Taylor v. Erna, No. 08-10534-DPW, 2009 U.S. Dist. LEXIS 61612, at *12 (D. Mass. July 14, 2009). Against that backdrop, Plaintiff contends

that Officer Cummings's police report is inadmissible hearsay,[1] and thus challenges Defendants' reliance on that report as admissible evidence supporting their statement of material facts.  (See, e.g., Docket #48-1 at 2-5).  As Defendants highlight in their reply, (Docket #49 at 1-3), it is well settled that a police report is admissible as a public record pursuant to Fed R. Evid. 803(8), see Taylor, 2009 U.S. Dist. LEXIS 61612, at *20-21 ("A police report is a public record or report for the purposes of Rule 803(8)(B)."); Bolduc v. United States, 265 F. Supp. 2d 153, 164 (D. Mass. 2003) ("[A]s this is a civil trial, the police reports, which recorded first-hand observations of officers, are admissible under the 'public records and reports' exception to the hearsay rule.") (citing Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2nd Cir. 1991) (stating that in civil trials "it is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted")).  Accordingly, Plaintiff's objections to Defendants' reliance on Officer Cummings's police report are without merit.

## II.   FACTS

Judith Gray was diagnosed with bipolar disorder when she was 25 years old, and also suffers from manic depression.  (PF 1A, 2C).[2]  In the early morning hours of May 2, 2013, Gray, who was 57 years old at the time, suffered a manic episode at her home in Athol, Massachusetts. (PF 1A, 2E).  After Gray called the Athol Police Department, three police officers responded and she was brought to the Athol Memorial Hospital.  (PF 2E, 2H).

---

[1]  Plaintiff also argues that the police report is not authenticated, but on April 28, 2016 Officer Cummings submitted an affidavit verifying his report.  (See Docket #49-1 at 1-8).

[2]  The term "PF" refers to Plaintiff Judith Gray's facts which can be found in her Response to the Town of Athol's Statement of Undisputed Material Facts.  (Docket #48-1).  The term "DF" refers to the Defendants' facts which can be found in their Statement of Undisputed Material Facts. (Docket #42).  The Defendants' facts are incorporated only to the extent they are admitted by Gray. (See Docket #48-1).

At 10:17 a.m. that same day, Athol Memorial Hospital informed the Athol Police Department that Gray, a Section 12 patient, had left the hospital and needed to be returned.[3] (DF 4).  Cummings later deposed that he understood a Section 12 patient to mean "that the person is a danger to either themselves or others."  (DF 6; Docket #42-3 at 3).  The Athol Police Department dispatched Officer Thomas Cummings to the area to look for Gray.[4]  (DF 7).  A short time later, Cummings observed Gray walking barefoot on the sidewalk along Main Street.  (DF 5, 8).  Cummings radioed to the dispatcher that he had made contact with Gray and gave the location. (DF 8).  Cummings pulled over and began to step out of his cruiser.  (DF 9).  Gray yelled "Fuck you" to Cummings immediately after he got out of the car.  (DF 10).  After Cummings informed Gray that she must return to the hospital, Gray responded "I'm not fucking going back," at which point Cummings called for backup.  (DF 11-13).

Cummings then followed Gray, walking westbound on the sidewalk of Main Street, for approximately twenty to twenty-five seconds while she repeatedly shouted obscenities at him.[5] (DF 14, 16, 18).  Gray then stopped and faced Cummings from a distance of approximately five feet with her fists, teeth, and body clenched.  (DF 20-21).  Gray appeared to be "looking right through" Cummings.  (DF 21).  Gray yelled "fuck you" to Cummings and started walking towards him.  (DF 22-23).  As Gray approached Cummings, Cummings grabbed her shirt and took Gray to the ground where she tucked her arms underneath her chest.  (PF 24A, 26A-B; DF 25, 27).

---

[3]  A "Section 12" patient is a person who was civilly committed for either being a danger to themselves or others.  (DF 6).

[4]  Cummings had two prior encounters with Gray when he was employed as a police dispatcher, the first on May 12, 2009 and the second on July 22, 2010.  (PF 1C).

[5]  At the time of the incident Gray was five foot ten and weighed approximately 140 pounds while Cummings was six foot three and weighed approximately 215 pounds.  (PF 5A-5B).

Cummings ordered Gray to stop resisting and place her hands behind her back and warned her that she would be "tased" if she did not place her hands behind her back immediately.[6]  (DF 28, 32).

Gray replied, "fucking do it!"  (DF 33).  Cummings then pulled out his department issued Taser, removed the cartridge so that it was in the drive stun mode, placed the Taser in the middle of Gray's back, and pulled the trigger.[7]  (DF 36).  Cummings held the Taser on Gray's back for about four to six seconds and Gray released her arms from underneath her chest and placed them behind her back.  (DF 38).  Cummings holstered the Taser and placed Gray in handcuffs.  (DF 39).  Once Gray was secured in handcuffs, Cummings used no further force.  (DF 40).  A back-up officer then arrived.  (DF 41).

While Gray was handcuffed, Cummings picked her up off the ground, walked her to a stone sculpture at the Common, had her take a seat, and then called an ambulance at 10:32 a.m. to respond.  (DF 42).  At 10:33 a.m., approximately ten minutes after Cummings first saw Gray, the ambulance arrived on the scene.  (PF 38B).  Gray was then returned to Athol Memorial Hospital.  (DF 48).

Cummings caused Gray to be summonsed to court for the following criminal charges: (1) assault on a police officer; (2) resisting arrest; (3) disturbing the peace; and (4) disorderly person.  (DF 49).  These charges were later either dropped or dismissed.  (PF 49A).

Lastly, with regard to Cummings's training and experience, Cummings graduated from the Boylston Regional Police Academy in 2011.  (DF 50).  At the academy, Cummings received

---

[6]  Cummings was certified on the Taser on September 7, 2012, after completing eight hours of instruction.  (DF 57-58).

[7]  The drive stun mode is a less painful mode of the Taser causing only localized pain and not muscular incapacitation.  (DF 60).

training on interacting with people with mental illness, including twelve hours of training in "Crisis Intervention and Conflict Resolution" and six hours of training in "People with Special Needs." (DF 52-55).

III.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

IV.   ANALYSIS

Defendants seek summary judgment on all of the claims in Gray's Amended Complaint: (I) excessive force against Cummings under 42 U.S.C. § 1983; (II) failure to train against the Town under 42 U.S.C. § 1983; (III) violation of the Americans with Disabilities Act ("ADA") against the Town; (IV) assault and battery against Cummings; (V) violation of the MCRA against Cummings; and (VI) malicious prosecution against Cummings.

A.   Qualified Immunity

Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. Al-Kidd, 563 U.S. 731, 743 (2011).  However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful."  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotations and citations omitted).

Courts use a two-part test to determine whether qualified immunity applies:  (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the alleged violation.  MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014).  Under the second prong of the test, the analysis involves two questions:  (1) whether the legal contours of the constitutional right were sufficiently clear; and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official. Id.  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it[;] [i]n other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quoting Ashcroft, 563 U.S. at 741).

1.  Violation of a Constitutional Right

Turning to the first part of the qualified immunity test, "[t]o establish a Fourth Amendment excessive force claim, a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009). A claim, as here, that a law enforcement officer used excessive force in making an arrest or seizure is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."

Graham v. O'Connor, 490 U.S. 386, 388 (1989).  Whether force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id., at 396.  To guide this balancing, the Graham Court expressly identified three factors to consider: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (citation omitted). Whether the force used to effect a particular seizure is reasonable must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Id. "The calculus of reasonableness also must make allowance for the need of police officers to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."  See Parker v. Gerrish, 547 F. 3d 1, 9 (1st Cir. 2008) (citations and internal quotations omitted).  Applying Graham factors I find that the single deployment of a taser in drive stun mode in these particular circumstances was reasonable.  See Morelli v. Webster, 552 F.3d at 24 ("By definition, excessive force is unreasonable force.  But reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force.  In that event, qualified immunity gives an officer the benefit of a margin of error.  Thus, defeating a qualified immunity defense requires a showing of an incremental degree of error -- an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim and, further, beyond the 'hazy border' noted by the [Court in Saucier v. Katz, 533 U.S. 194 (2001)].") (internal citations omitted).

**The Severity of the Crime at Issue**

While a close call, I find that the first Graham factor favors Defendants.  As argued by Defendants, the record supports a finding that Ms. Gray assaulted Officer Cummings and, in doing

so, also resisted a lawful arrest.[8]  "The classic definition of assault and battery is 'the intentional and unjustified use of force upon the person of another, however slight.'"  Commonwealth v. Welch, 16 Mass. App. Ct. 271, 273 (1983) (quoting Commonwealth v. McCan, 277 Mass. 199, 203 (1931)).  As such, it is an offense that is serious because of the potential for violence and injury.  Parker, 547 F.3d at 9 ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.") (citations omitted).  It jeopardized the safety of Cummings, and it threatened the safety of the community as well, should a successful assault result in the attacker taking the officer's firearm.  In this case, it is undisputed that after Cummings followed Gray on foot and closed within five feet behind her, Gray turned to face Cummings, her hands, teeth and body clenched, and then approached Cummings in such a way that Cummings felt the need to assume a defensive posture, including extending his arm to stop her or grab her. (DF 19-25).  Moreover, it is clear that Cummings, who had just exited his police cruiser, was a police officer, with authority to make a lawful seizure.  (DF 9-10).  Given this record, the crime was serious in that it presented a risk of danger to Cummings and the public, and demonstrated Gray's refusal to comply with lawful authority.

In her opposition, Ms. Gray denies that there was a crime.  See Opp. pp. 5-6.  This argument ignores the facts which are recited in the previous paragraph and, arguably her own complaint. Gray has no recollection of the incident, and the undisputed evidence shows that Gray turned on Cummings and approached him in a threatening manner.  While it is true that when Officer

---

[8]  While the court does not wish to place too much on the allegations in the amended complaint, a fair reading of paragraph 48 is a concession by Ms. Gray that she assaulted Cummings, albeit that Cummings precipitated the assault.  (See Docket #27 ¶ 48) ("Officer Cummings should have respected her comfort zone . . . rather than precipitating an assault and battery.").

Cummings first approached Gray no crime had been committed, in the short time before Cummings brought Gray to the ground and tased her, an objectively reasonable assessment of the circumstances establishes that Gray had committed a serious offense.

### The Suspect Poses an Immediate Threat to the Safety of the Officer and Others

The second Graham factor is whether the person posed "an immediate threat to the safety of the officers and others." Id., at 396. I find that this factor also marginally favors Defendants.

At the time that Officer Cummings deployed a taser, "a reasonable officer on the scene," Graham, 490 U.S. at 396, could consider Gray's mental state. Gray was the subject of an involuntary commitment order, pursuant to Mass. Gen. Laws ch. 123, § 12, and therefore actually or potentially posed "a likelihood of serious harm by reason of mental illness." See Mass. Gen. Laws ch. 123, § 12(a), (b). Here, moreover, Gray showed conspicuous signs of mental illness. She was emotionally distraught, apparently sufficiently disoriented to be walking barefoot (on a morning in early May), and was fleeing mental health care it had been determined that she needed. Gray failed to comply with every request or directive Cummings had issued, responding to Cummings with profanities and profanity-laced statements of defiance ("fuck you"; "I'm not fucking going back."). (DF 10, 12). Even before Gray turned on Cummings, Cummings was confronted with circumstances which would "lead an officer to be wary." Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010).

However, quite apart from circumstances relevant to and evidencing Ms. Gray's state of mind, was an act of violence toward Officer Cummings. As discussed above, it is undisputed that Gray reversed course when being followed by Cummings, and with actions that could reasonably interpreted as threatening, such as clenching her fist and body, approached Cummings. At the time of the tasing, Gray and Cummings were still in physical contact that, reading the record in

the light most favorable to Gray, Cummings initiated to defend himself.  This is unlike cases where a person may exhibit volatile and erratic behavior, but the behavior was not directed toward the officer, and thus not found to pose or convey a threat.  Cf. Bryan, 630 F.3d at 827-28.  Lastly, consistent with Gray's defiance of Cummings's other requests and directives, Gray refused to surrender her arms for handcuffing, even after Cummings threatened to use a taser, but before ever doing so. Gray's refusal not only escalated and prolonged any struggle with Cummings, but it could reasonably be understood to convey to Cummings that force, at some greater level than the use of hands, was going to be necessary to return Gray to the hospital.  See Draper v. Reynolds, 369 F.3d, 1270, 1278 (11th Cir. 2004) ("[A] verbal arrest command accompanied by attempted physical handcuffing in these particular circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either [the motorist or the officer] would be seriously hurt.  Thus, there was a reasonable need for some use of force in this arrest").  This second factor favors Defendants.

**Whether Gray Resisted Seizure**

The last Graham factor is whether the person actively resisted arrest.  I find this factor favors Defendants.  At the time of deployment of the taser, as argued by Defendants, Gray was actively resisting by refusing to release her arms to be handcuffed.  Her resistance was consistent with her defiance of Cummings throughout this encounter.

Ms. Gray argues that "by the time Cummings had [Gray] on the ground, there was no evidence there was an immediate danger and her mere refusal to pull her arms out and put them behind her back could not justify use [of] a Taser on her."  (See Docket #48 at 7).  This argument ignores the larger factual context for the struggle between Cummings and Gray:  Gray had engaged in assaultive behavior; she was violent in both her language and actions, such that Cummings felt

10

the need to defend himself.  Once Gray was on the ground, any reasonable officer would be justified, indeed obligated, to consider Gray's assaultive conduct and offensive language in assessing whether Gray's refusal to surrender her arms posed an immediate danger, including the prospect of an escalation in her resistance.  Contrary to Gray's argument, I find that it could. Cummings was armed and Gray and Cummings were in close physical contact.  If that contact escalated into a further struggle, it is plausible that Gray could have obtained control of Cummings firearm, or another weapon on his person, thereby threatening his safety, Gray's and the public's. See Bryan, 630 F.3d at 830 ("Resistance, however, should not be understood as a binary state, with resistance being either completely passive or active….  [T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying the resistance."); Parker, 547 F. 3d at 9 ("The calculus of reasonableness also must make allowance for the need of police officers to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation.").

### Failure to Warn and Use Alternatives to Effect Arrest

Two other considerations which courts have factored into whether a use of force is reasonable are a failure to warn before the use of force and the failure to use alternatives to effect arrest.  See Bryan, 630 F.3d at 831 (discussing factors and cases).  I consider both here.

First, as noted above, it is undisputed that Officer Cummings warned Ms. Gray that her failure to comply with his order to release her arms for handcuffing would result in her being tased. This warning was issued as Gray and Cummings remained in physical contact.  Gray precipitated such contact by turning on Cummings and approaching him with hands and body clenched. Moreover, there is no question that Gray heard and understood Cummings's warning:  she responded, "Fucking do it!"  (DF 33).  Cf. Bryan, 630 F.3d at 827-28 (discussing whether motorist

stopped for seat belt violation even heard or understood officer's commands).  This factor supports a finding that Cummings's deployment of the taser was reasonable.  Gray demonstrated that she was not going to comply with lawful orders without some increase of force beyond the use of hands.  Moreover, as Defendants note, once Gray complied, there was no further deployment of the taser.

I consider also whether alternatives to force were available, particularly because Ms. Gray's opposition (and her expert) make much of the availability of de-escalation techniques. Gray's over-arching argument is that Officer Cummings precipitated the struggle and, in effect, violated Gray's Fourth Amendment rights by failing to employ de-escalation techniques, wait for the back-up, and call for an ambulance.  (See Docket #48 at 5).  In support of this argument, Gray relies on Stamps v. Town of Framingham, 813 F.3d 27 (1st Cir. 2016), for the proposition that the creation of conditions that may result in the use of excessive force violates the Fourth Amendment. (See Docket #48 at 5).  This is a thoughtful argument, but I recommend that the court reject it here.

Stamps is inapposite.  There, a SWAT team executed a warrant at Stamps' residence to locate Stamps' son and others suspected of drug dealing.  See Stamps, 813 F.3d at 30.  Stamps, who was not suspected of unlawful conduct, was ordered to the floor.  Id. at 31 .  Stamps complied, lying on the floor with hands raised above his head.  Id.  Stamps was guarded by an officer who with finger on the trigger and the safety disabled, pointed a loaded rifle at Stamps' head.  Id.  The officer accidentally fired the weapon killing Stamps.  Id.  The Court of Appeals found that "[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny."  Id. at p. 35.  Indeed, the Court of Appeals determined that the constitutional violation, quite apart from the tragic shooting of Stamps, was the creation of such a high risk

condition.  See id. ("[D]efendants' [argument that the Fourth Amendment does not apply in these circumstances because the shooting itself was unintentional] has the perverse effect of immunizing risky behavior only when the foreseeable harm of that behavior comes to pass.").  Apart from the shooting, such conduct was objectively unreasonable and excessive.

Officer Cummings's conduct, on the other hand, did not create an unnecessary, high risk of harm to Ms. Gray.  He did no more than follow Gray on foot and communicate a lawful and necessary order: that she return to the hospital.  Such conduct cannot be likened to the conduct in Stamps, and, more importantly, cannot be said to be objectively unreasonable or excessive.

Courts have recognized that in the totality of the circumstances calculus, the availability of other, less intrusive, tactics is a factor.  See e.g. Bryan, 630 F.3d at 831 ("[W]e have held that police are required to consider what other tactics if any were available to effect the arrest.") (internal quotations and citations omitted).  However, it is also clear that alternatives to the force used is only one factor among others in the ultimate objective reasonableness analysis, and alone is not dispositive.  See id. ("[T]hus, while by no means dispositive . . . failure to consider less intrusive means factor significantly in our Graham analysis").  Indeed, in considering whether alternatives to deal with persons who exhibit signs of mental illness should be employed, courts "have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."  Id. at 829 (citations omitted); Doerle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals.  Instead we emphasize that where . . . the individual is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed.").  Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013) (when officer "encountered a naked man making nonsensical

statements and asking to be taken to jail . . . the question is not whether any force was justified.  It is, instead whether [the officer] . . . could reasonably use the <u>degree</u> of force employed") (emphasis in original).  <u>See</u> <u>Estate of Armstrong v. Village of Pinehurst</u>, 810 F 3d 892, 900 (4th Cir. 2016) ("Mental illness . . . does not dictate the same police response in all situations.").  The analysis remains, under <u>Graham</u>, the reasonableness of the force used.

Here, I disagree with Ms. Gray that the failure to employ de-escalation techniques alters the reasonableness calculus.  While Officer Cummings had received training in dealing with persons with disabilities he could have used, (DF 52-55), this was a rapidly unfolding situation.  Gray responded to nothing more than the arrival of Cummings with profanities.  She ignored or failed to comply with each request and order that he issued and fairly conveyed that she was not going to cooperate.  In response to Cummings doing no more than following her, she turned and assaulted him.  Finally, she refused to surrender her arms for handcuffing, conveying to Cummings that something more than the use of hands was going to be necessary to return her to Athol Memorial.  It is not clear that in such circumstances alternatives to Cummings's escalating, but measured use of force were available.  To the extent they were, I find that this factor does not significantly impact the core <u>Graham</u> factors and the overall reasonableness assessment.

Based on the foregoing analysis, I find that that the undisputed record establishes that in the circumstances that confronted Officer Cummings, the single deployment of a taser in drive stun mode did not violate Ms. Gray's Fourth Amendment rights, and that Defendants are entitled to summary judgment as a matter of law on Count I.

2.  Clearly Established Right

Notwithstanding my conclusion that, as a matter of law, the undisputed facts demonstrate that there was no constitutional violation, I further find that even if there was a constitutional

violation, Cummings would nonetheless be entitled to qualified immunity because his actions did not violate any clearly established right.  This inquiry into whether the constitutional right was clearly defined involves a two-part inquiry: (1) whether the legal contours of the constitutional right were sufficiently clear; and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official.  As the First Circuit has explained, the "salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009); see Mullinex v. Luna, 136 S. Ct. 305, 308 (2015) (noting that a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates the right") (quoting Reichle v. Howards, 132 S. Ct. 2088 (2012)).

        With these precedents as guidance, the question is whether at the time of the incident in May 2013, it was clearly established that the single application of a taser constituted excessive force against a person who had assaulted a police officer and when immediately brought to the ground by the officer actively resisted lawful arrest.  "The law is clearly established when the plaintiff can point either to cases of controlling authority in his jurisdiction at the time of the incident, or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful."  See Kent v. Oakland County, 810 F.3d 384, 395 (6th Cir. 2016) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999) (citations omitted)).  Case law in and outside the First Circuit is such that a reasonable officer in Cummings's position would not have understood that the single deployment of a taser in these particular circumstances violates Ms. Gray's Fourth Amendment rights.

In the First Circuit, as of 2008, it was clearly established that a person arrested for an offense that does not present a risk of danger, who offered no significant active resistance to being handcuffed, and who posed no threat to the safety of officers could not be tased without warning. See Parker, 547 F.3d at 9-11.  However, the reasoning of Parker would not extend to the instant case where the use of taser was preceded by an assault on the arresting officer, resistance to arrest and a warning that a taser would be deployed if resistance persisted.  See Id. at 10 ("We do not hold that the officers would have been required to physically wrestle Parker to the ground without recourse to the Taser. Rather, we find that the jury could have concluded that such a struggle would not have been necessary -- that in the absence of the Taser, Parker would have submitted to cuffing without presenting a risk to the officers.").  Beyond cases which stand for the more general proposition, not disputed by any party here, that force employed must be reasonable, there is no clear First Circuit precedent on what circumstances justify use of a taser.

There is a consensus of cases from other circuits which similarly would have caused Officer Cummings to understand that his use of a taser on Ms. Gray in the circumstances of this case was constitutional.  In Hagans v. Franklin County Sheriff's Office, 695 F.3d 505 (6th Cir. 2012), the Appeals Court undertook a review of cases from the Sixth Circuit and other courts as of approximately 2007.  It found "[c]ases from this circuit and others, before and after May 2007 adhere to this line:  If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Id. at 509.

Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), involved the use of a taser during the arrest of an aggressive, argumentative motorist who had been stopped for a license plate light violation.  Id. at 1273.  Following the stop of Draper's truck and Draper's meeting the officer at the back of the truck, the officer asked Draper four times to retrieve paperwork from the cab of his

truck.  Id.  Draper failed to comply with each request, and became more confrontational and belligerent, accusing the officer of harassing and disrespecting him.  Id.  At the fifth request, Draper again refused, yelled at the officer and approached him with such agitation that the officer deployed his taser.  Id.  The Eleventh Circuit upheld the determination that the force was not excessive, finding that an attempt to handcuff Draper would have or might have escalated into a serious struggle which threatened the safety of Draper and the officer.  Id. at 1278.

In Estate of Armstrong, Armstrong suffered from a bipolar disorder and paranoid schizophrenia.  810 F.3d at 896.  In April 2011, he had been off his medications and was poking holes in his skin to "let the air out."  Id.  Armstrong's sister persuaded Armstrong to check into a hospital, but Armstrong became frightened while in the emergency room and fled.  Id.  Armstrong was determined by a doctor to be danger to himself, and officers were called to return Armstrong. Armstrong was located at a busy traffic intersection nearby.  Id.  Three officers approached Armstrong, who reacted by grabbing a 4x4 post that supported a traffic sign.  Id.  An attempt to pry him away was unsuccessful.  Id. at 897.  By this time two security guards and Armstrong's sister were present.  Id.   After 30 seconds or so, Armstrong was warned that he would be tased if he did not release the post.  Id.  Refusing to cooperate, an officer tased Armstrong five times, none of which succeeded in obtaining Armstrong's compliance.  Id.  Then the officers and two security guards physically pried Armstrong from the post.  Id.  The Fourth Circuit found that the use of the taser was excessive force.  Id. at 906.  Nevertheless, the Appeals Court affirmed finding that the officers were entitled to qualified immunity.  Id. at 907.

> Armstrong's right not to be tased while offering stationary and non-violent resistance to a lawful seizure was not clearly establish on April 23, 2011.   Indeed, two months after Appellees' conduct in this case, one of our colleagues wrote, "the objective reasonableness of the use of Tasers continues to pose difficult challenges to law enforcement agencies and courts alike…'That the law is still evolving is illustrated in cases granting qualified immunity for that very reason.'"

Id. at 909.

Based on this state of the law, which by no means is exhaustive, but merely representative, I find that a reasonable officer in Cummings's position would not have understood that using a taser in the circumstances of this case was unlawful. Not only was Ms. Gray resisting arrest, but her arrest occurred within the context of her assaults, physical and verbal, on Cummings.

In her opposition, Ms. Gray cites to cases that stand for the unremarkable proposition that it is unlawful to deploy a taser on a misdemeanant who is not actively resisting arrest and who does not pose a danger. (See Docket #48 at 7 (citing cases)). That statement of the law possibly represents another somewhat settled proposition about the use of tasers. However, Gray's citations are unhelpful since it is clear that Gray resisted arrest and it is undisputed that what precipitated her contact with Officer Cummings was her own aggressive, assaultive conduct.

I recognize that even looking to these precedents invites fair argument whether the facts are sufficiently analogous to the situation confronting Officer Cummings on May 2, 2013. To be sure, a small change in facts can lead to a very different result. See e.g. Meyers v. Baltimore Cnty, Md., 713 F.3d 723 (4th Cir. 2013) (officers responding to domestic call encountered bi-polar person holding bat authorized to use taser three times to disable individuals but once officers were laying on top of individual, additional seven deployments were excessive force). However, a fair assessment of case law as of 2013 supports the dichotomy drawn by the Sixth Circuit in Hagans, authorizing the use of a taser when a person subject to lawful arrest refuses to be handcuffed, at least insofar as a taser is used to achieve compliance, and no more. Moreover, I am persuaded by the finding of the Fourth Circuit in Armstrong, that the right not to be tased while offering non-violent and stationary resistance to a lawful seizure was not clearly established in April 2011, particularly because, unlike Armstrong, Ms. Gray was offering resistance, and her resistance to

18

being handcuffed immediately followed her assault on Cummings. As the Fourth Circuit recognized only last year, the law regarding the use of tasers is still evolving. Armstrong, 810 F.3d at 909. That is precisely what reduces the clarity of the contours of the right asserted here.

Accordingly, I recommend that even if the reviewing court determined that the force used here was excessive, the contours of the constitutional right was not sufficiently clear, and in the specific factual context of this case, the violation would not have been clear to a reasonable official. Thus I recommend that the motion for summary judgment be granted as to Count I.

B.      Count II – Section 1983 against the Town

In her amended complaint, Ms. Gray also asserts a § 1983 claim against the Town, alleging that the policies and customs of the Town caused Cummings to violate Gray's constitutional rights. (Docket #27 ¶ 41). A municipality cannot be held liable pursuant to § 1983 for a failure to train unless the plaintiff has first established a constitutional violation by one of the Town's officers. See Rivera v. City of Worcester, No. 12-40066-TSH, 2015 U.S. Dist. LEXIS 19251, at *14 (D. Mass. Feb. 18, 2015) (citing Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996) (holding that "the City cannot be held liable absent a constitutional violation by its officers"). In light of my finding that there has been no constitutional violation, I recommend that the Court grant summary judgment as to Count II.

C.      Count III – Americans with Disability Act

In Count III of the amended complaint, Gray makes a claim pursuant to the ADA, 42 U.S.C. § 12101, alleging that "the Town of Athol failed to provide a reasonable accommodation for [Gray's] disability when Officer Cummings used excessive force against her and brought criminal charges against her without taking her mental illness into account." (Docket #27 ¶ 47). Plaintiff also contends that "Officer Cummings should have respected [Gray's] comfort zone,

engaged in nonthreatening communications, and used the passage of time to defuse the situation and contact an ambulance rather than precipitating an assault and battery." (Docket #27 ¶ 48).

"To state a claim under Title II of the ADA, the plaintiff must allege that 1) she is a qualified individual with a disability,[9] 2) she was either excluded from participation in or denied the benefits of a public entity's services or programs and 3) such exclusion was by reason of her disability." Montae v. Am. Airlines, Inc., 757 F. Supp. 2d 47, 52 (D. Mass. 2010) (citing 42 U.S.C. § 12132. In cases involving an alleged wrongful arrest, other circuits have relied on two general theories of liability: "(1) where the police wrongfully arrest someone with a disability because they misperceive the effects of that disability as criminal activity and (2) where police fail reasonably to accommodate a person's disability during the investigation or arrest, *causing the person to suffer greater injury than otherwise would occur*." Patino v. City of Revere, No. 13-11114-FDS, 2014 U.S. Dist. LEXIS 5639, at *21 (D. Mass. Jan. 16, 2014) (quoting Montae, 757 F. Supp. 2d at 52) (emphasis added); see Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999). Notably, it appears that the First Circuit has not ever adopted these theories of liability under the ADA; however, other courts in this Circuit have nonetheless undertaken such an analysis, and this Court will therefore similarly follow suit. Cf. Buchanan v. Maine, 469 F.3d 158, 177 (1st Cir. 2006).

As an initial matter, Gray's complaint very clearly proceeds solely on the basis of the second theory of liability—that is, an alleged failure to reasonably accommodate. (Docket #27 ¶ 47) ("Specifically, the Town of Athol failed to provide a reasonable accommodation for [Gray's] disability . . . ."); (Docket #27 ¶ 48) (listing ways officer allegedly should have accommodated Plaintiff). However, in her opposition to the motion for summary judgment, Gray, for the first time, outlines an argument relating to the first theory of liability, stating that Gray "is entitled to

---

[9] Defendants do not argue that Plaintiff is not a qualified individual for purposes of the ADA.

proceed on the first theory because the jury could find that Cummings used excessive force against [Gray] and brought criminal charges against her because he 'misperceived' the effects of [Gray's] disability as 'criminal activity.'"   (Docket #48 at 11).

This Court notes that a plaintiff is "not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006).  Nonetheless, the undersigned will consider the merits of such argument given that the Defendants addressed the theory in cursory fashion, stating that "Officer Cummings did not wrongly arrest the Plaintiff because he misperceived the effects of the Plaintiff's disability as criminal activity.  Rather, he seized the Plaintiff because she committed an assault and battery on a police officer." (Docket #41 at 16).

With regard to the first theory, Gray's chief argument is that Plaintiff's "inability to comply with [Officer Cummings's] instructions was plainly one effect of her disability, as were her staring at him and using loud and vulgar language."   (Docket #48 at 11).   Contrary to Plaintiff's contentions, and as the Defendants argue, Gray's disability was not misperceived as criminal conduct; rather, it was her assault and battery upon Officer Cummings that was perceived as—and in fact was—criminal conduct, resulting in the use of force by Officer Cummings to defend himself.  To be sure, Plaintiff has no recollection of the incident, (DF 2-3), and is therefore unable to offer any evidence to controvert the allegation that she assaulted Cummings.  Because Plaintiff's assaultive behavior principally precipitated her arrest, her argument pursuant to the first theory under the ADA must fail.  See Gohier, 186 F.3d at 1221 (holding that "[the officer] did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful.  Neither did [the officer] fail to accommodate Lucero's disability while arresting him for 'some crime unrelated to his disability.'

Instead, [the officer] used force on Lucero while Lucero was committing an assault related to his disability.") (internal citation omitted); see also Hainze v. Richards, 207 F.3d 795, 801-02 (5th Cir. 2000) ("We are not persuaded that requiring [the officer] and other similarly situated officers to use less than reasonable force in defending themselves and others, or to hesitate to consider other possible actions in the course of making such split-second decisions, is the type of 'reasonable accommodation' contemplated by Title II.").  Moreover, the first theory is further unavailing because Officer Cummings undoubtedly knew that Plaintiff was mentally ill, given that he was responding to her escape from a mental hospital; knew she was a Section 12 patient at that mental hospital; and had previous encounters with Plaintiff relating to her mental health history.  (DF 4, 6; PF 1C).

To the extent that Officer Cummings's use of force should be bifurcated into the use of force to take down Plaintiff as she assaulted him and the use of the taser to further defend himself and effectuate arrest while she resisted, Plaintiff's argument under the first theory still fails.  The uncontroverted record evidence establishes that after Plaintiff assaulted Cummings a struggle ensued whereby Cummings attempted to arrest Plaintiff but she resisted arrest.  (DF 26-35).  To that end, Plaintiff refused to take her arms out from under her body, and was warned that her failure to comply would result in her being tasted.  In this light, Officer Cummings used force against the Plaintiff as part of a spectrum of self-defense measures given that the struggle was ongoing, and even if the use could not be construed as self-defense it was nonetheless to alleviate the threat posed by a suspect—albeit smaller in size and stature than Cummings—who was actively resisting arrest immediately after having assaulted the officer.

With regard to the second theory, Plaintiff must show that the "police fail[ed] reasonably to accommodate [her] disability during the investigation or arrest, *causing [her] to suffer greater*

*injury than otherwise would occur.*"  Patino v. City of Revere, No. 13-11114-FDS, 2014 U.S. Dist. LEXIS 5639, at *21 (D. Mass. Jan. 16, 2014) (quoting Montae, 757 F. Supp. 2d at 52) (emphasis added).  To that end, Plaintiff asserts that "Cummings never would have tased [Plaintiff] if she were not disabled. . . .  After approaching her in entirely the wrong way, Cummings escalated the situation, came within five feet of [Plaintiff], and threw her to the ground when he allegedly felt she was going to come at him.  Then, while he had her on the ground face down, Cummings ordered Gray to bring her hands behind her back and her disability prevented her from complying . . . ." (Docket #48 at 12).

Defendants miss the mark with their argument that Plaintiff's ADA claim pursuant to the second theory fails "because [Plaintiff] cannot show that the Taser caused her to be injured to a greater extent than a non-disabled person."  The inquiry is not whether the use of a taser would hurt a disabled person more than a non-disabled person; rather, the question is whether the disability resulted in the misapplication of force or caused a "greater indignity in the process than other arrestees."  See Gohier, 186 F.3d at 1220-21.

In that light, the crux of the issue is whether, as Plaintiff alleges, she would not have been tased if she was not disabled.  (Docket #48 at 12).  Contrary to Plaintiff's contention, I find that the officer justifiably could and would have used a taser against the Plaintiff regardless of her mental illness because his use of force was the result of her assault on him and continued resistance to arrest immediately following that combative behavior.  (DF 26-35).  In assessing that contention, I find particularly instructive the Fifth Circuit's discussion in Hainze, 207 F.3d at 801, reasoning that:

> Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.  Law enforcement personnel conducting in-the-field

23

> investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

Id. The facts underlying the court's discussion in Hainze are distinguishable from the instant case such that that case involved an officer using deadly force in response to a mentally-ill person wielding a knife and coming toward the officer. Id. Notwithstanding that difference however, Hainze is instructive with regard to the second theory because it is illustrative of the notion that officers can use the appropriate level of force in response to an ongoing threat. Here, the threat was not a deadly weapon, but a threat nonetheless existed jeopardizing the safety of Officer Cummings in the wake of Plaintiff's assault and battery on him and the ensuing struggle. Indeed, in that respect this case is more akin to the Tenth Circuit's decision in Gohier v. Enright, 186 F.3d 1216, 1220-21 (10th Cir. 1999) (holding that "[the officer] did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did [the officer] fail to accommodate Lucero's disability while arresting him for 'some crime unrelated to his disability.' Instead, [the officer] used force on Lucero while Lucero was committing an assault related to his disability.") (internal citation omitted); see Higgins v. Bubar, No. 1:11-cv-00148-NT, 2012 U.S. Dist. LEXIS 108054, at *39 (D. Me. Aug. 2, 2012). I therefore recommend that the Court grant Defendants' motion for summary judgment as to Count III because both of Plaintiff's theories under the ADA fail as a matter of law.

D.      Count IV – Assault and Battery

As the First Circuit explained, the determination of the reasonableness of the force used under § 1983 also "controls [the] determination of the reasonableness of the force used under . . . common law assault and battery claims." Hunt v. Massi, 773 F.3d 361, 372 (1st Cir. 2014) (citing Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010)).   Because I have already concluded that Officer Cummings did not use excessive force, I similarly conclude that Officer Cummings must not have used "intentional and unjustified . . . force upon the person of another," as required to satisfy Plaintiff's claim for assault and battery, see Commonwealth v. Porro, 458 Mass. 526, 939 N.E.2d 1157, 1162 (Mass. 2010) (citation omitted) (internal quotation marks omitted).

E.      Count V – Massachusetts Civil Rights Act

I recommend granting the Defendants' Motion for Summary Judgment (Docket #41) as to Count V of the amended complaint, alleging a violation of the Massachusetts Civil Rights Act by Officer Cummings.

The Massachusetts Civil Rights Act ("MCRA") is the state analog to § 1983 and prohibits persons from "interfer[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass. Gen. Laws ch. 12, § 11H; see Mass. Gen. Laws ch. 12, § 11I (providing a civil cause of action for aggrieved persons based on section 11H).  "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or

attempted interference was by threats, intimidation or coercion." <u>Muldoon v. Dep't of Corr.</u>, No.: 15-cv-13892-DJC, 2017 U.S. Dist. LEXIS 17105, at *7-8 (February 7, 2017) (quoting <u>Do Corp. v. Town of Stoughton</u>, No. 13-cv-11726-DJC, 2013 U.S. Dist. LEXIS 172199, at *12 (D. Mass. Dec. 6, 2013)) (alteration in original).

Pursuant to the MCRA, a threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." <u>Muldoon v. Dep't of Corr.</u>, No.: 15-cv-13892-DJC, 2017 U.S. Dist. LEXIS 17105, at *9 (D. Mass. February 7, 2017) (quoting <u>Ayasli v. Armstrong</u>, 56 Mass. App. Ct. 740, 750 (2002)).  Intimidation means putting someone "in fear for the purpose of compelling or deterring conduct." <u>Id.</u> (quoting <u>Ayasli</u>, 56 Mass. App. Ct. at 750).  Finally, coercion is "the application to another of such force, either physical or moral, as to" make someone do something against his or her will. <u>Ayasli</u>, 56 Mass. App. Ct. at 750.

The Massachusetts Supreme Judicial Court has held that MCRA claims are subject to the same standard of qualified immunity for police officers that applies to § 1983 claims. <u>See</u> <u>Raiche</u>, 623 F.3d at 40 (citing <u>Duarte v. Healy</u>, 537 N.E.2d 1230 (Mass. 1989)); <u>see also</u> <u>Hunt</u>, 773 F.3d 371-72; <u>Spencer v. Roche</u>, 755 F. Supp. 2d 250, 263 (D. Mass. 2010) ("When it enacted the MCRA, the Massachusetts legislature intended to adopt the standard of immunity for public officials developed under 42 U.S.C. § 1983.").  Thus, Plaintiff's MCRA claim is necessarily precluded because I have already determined that Officer Cummings is protected by qualified immunity. <u>See, e.g.</u>, <u>Meagher v. Andover Sch. Comm.</u>, 94 F. Supp. 3d 21, 44-45 (D. Mass. 2015) (concluding that because defendant officer was entitled to qualified immunity, defendant was also immune from MCRA claim); <u>Stull v. Town of Weymouth</u>, No. 11-11549-JLT, 2013 U.S. Dist. LEXIS 146058 (D. Mass. Oct. 9, 2013) ("Because the Officer Defendants are entitled to qualified immunity for Plaintiffs' § 1983 claims, they are also immune to Plaintiffs' MCRA claims.")

(footnote omitted); <u>Spencer</u>, 755 F. Supp. 2d at 264 (concluding that defendant nurse immune from MCRA claim based on qualified immunity determination).

F.      Count VI – Malicious Prosecution

In the final count of her amended complaint, Gray asserts a claim of malicious prosecution against Cummings, alleging that he caused criminal charges to be brought against her without probable cause and with malice.  (Docket #27 at ¶¶ 56-58).  Here, a criminal complaint was issued against Plaintiff based on Officer Cummings's application for a complaint for the following four offenses: (1) assault on a police officer, Mass. Gen. Laws ch. 265, §§ 13A, 13D; (2) resisting arrest, Mass. Gen. Laws ch. 268, § 32B; (3) disturbing the peace, Mass. Gen. Laws ch. 272, § 53; and (4) disorderly person, Mass. Gen. Laws ch. 272, § 53.  (Docket #27 ¶ 30).  Defendants argue that summary judgment should enter for Cummings because there is no evidence of malice and there was probable cause for Gray's arrest and the criminal charges asserted against her.  (Docket #44 at 18).

"To prevail on a claim for malicious prosecution, a plaintiff must establish that he was damaged because the defendant commenced the original action without probable cause and with malice, and that the original action terminated in his favor."  <u>Chervin v. Travelers Ins. Co.</u>, 448 Mass. 95, 103 (2006).  Here, the key inquiry is whether Officer Cummings had probable cause for each offense because malice can be inferred from the lack of probable cause, <u>id.</u> at 109, and because there is no dispute that the criminal proceedings terminated in Plaintiff's favor, (<u>see</u> Docket #27 ¶ 31).

Probable cause exists when the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an

offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004) ("The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable.").

### 1.      Assault and Battery

An assault and battery is "the intentional and unjustified use of force upon the person of another, however slight."  Commonwealth v. Porro, 939 N.E.2d 1157, 1162 (Mass. 2010).  To qualify as an assault and battery upon a police officer, the victim-officer must be "engaged in the performance of his duties at the time of such assault and battery."  Mass. Gen. Laws ch. 265, § 13D.  Here, Officer Cummings had probable cause to believe that Plaintiff had committed an assault and battery on him.  The uncontroverted facts establish that Plaintiff turned around and looked at Cummings with clenched teeth and a clenched fist before coming at him, at which point he used force to take her down.  (DF 18-35).   A fair reading of Plaintiff's argument is not that she did not attack Officer Cummings, but rather that his actions catalyzed his own attack.  (See Docket #27 ¶ 48) ("Officer Cummings should have respected her comfort zone . . . *rather than precipitating an assault and battery*.") (emphasis added).  On a related note, Plaintiff also argues that her mental illness would have resulted in a finding that she lacked substantial capacity either to appreciate the criminality of her conduct or to conform to the requirements of the law. (Docket #48 at 14).  This argument is unpersuasive because even if there was such a finding at a later date, that would not negate probable cause at the time of arrest.  To that end, Plaintiff fails to offer any authority that a prospective defense of a lack of criminal responsibility could undermine an officer's determination of probable cause.

2.      Resisting Arrest

"A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another."  Mass. Gen. Laws ch. 268, § 32B.  Probable cause for resisting arrest existed here because Plaintiff tucked her arms underneath her chest and flexed tightly in an effort to resist being handcuffed.  (DF 26-35).  Officer Cummings ordered Plaintiff to stop resisting and warned her she would be tased if she did not comply, to which she replied "fuck you" and "fucking do it!"  (DF 28-33).  Additionally, given my earlier finding that Cummings did not use excessive force, Gray's argument that she had the right to resist arrest is without merit.  Thus, probable cause existed for Plaintiff's charge of resisting arrest.  See Commonwealth v. Lender, 847 N.E.2d 350, 353 (Mass. 2006) ("The defendant's resistance to being handcuffed and placed in the cruiser is sufficient resistance to amount to . . . a means creating a substantial risk of causing bodily injury to the arresting officer.").

3.      Disturbing the Peace

Breach of peace is an elastic concept.  Commonwealth v. Baez, 678 N.E.2d 1335, 1338 (Mass. 1997).  "To find a breach of the peace . . . an act must at least threaten to have some disturbing effect on the public."  Id.  An officer may make a warrantless arrest for a breach of the peace where it "(1) involves a breach of the peace, (2) is committed in the presence or view of the officer . . . and (3) is still continuing at the time of the arrest or only interrupted, so that the offen[s]e and the arrest form parts of one transaction."  Commonwealth v. Conway, 316 N.E.2d 757, 759 (Mass. 1974).  The record evidence demonstrates the Officer Cummings had probable cause to

29

arrest Plaintiff for disturbing the peace because she was continually screaming profanities at Officer Cummings and passersby.  (See, e.g., DF 10, 12, 18, 22, 29).  Plaintiff continued using vulgarities as she assaulted Cummings and resisted arrest.  (DF 25-36).  Probable cause therefore existed as to Plaintiff's alleged breach of the peace.

### 4.      Disorderly Conduct

Section 53 of Chapter 272 of the Massachusetts General Laws permits the punishment of "persons who with offensive and disorderly acts or language accost or annoy another person[.]"  Mass. Gen. Laws ch. 272, § 53(a);  see Philbrook v. Perrigo, 637 F. Supp. 2d, 53-54 (D. Mass. 2009).  Here, probable cause could have been based on Plaintiff's loud and offensive language, coupled with her assault and battery and subsequent refusal to comply with Officer Cummings's lawful orders.  (DF 25-36).  Because I find that probable cause existed as to all four charges, I recommend that this Court grant summary judgment as to Count VI of the amended complaint.

## V.      CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that the motion for summary judgment (Docket #40) be ALLOWED.[10]

---

[10]   The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.   The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72(b)(2).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).

<u>/S/ David H. Hennessy</u>
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE